IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**JAMES WESLEY SMITH,**

    Petitioner,

v.                                                                                        Civil Action No. 3:15CV651

**HAROLD W. CLARKE,**

    Respondent.

## MEMORANDUM OPINION

James Wesley Smith, a Virginia state prisoner proceeding with counsel, brings this petition pursuant to 28 U.S.C. § 2254. ("§ 2254 Petition," ECF No. 1.) A grand jury in the Circuit Court of the County of Mathews charged Smith with abduction with intent to defile after having previously been convicted of rape and aggravated sexual battery after having been convicted of rape.[1] (Indictments 1–2, ECF No. 7–4.) Smith's first trial ended in a hung jury. (§ 2254 Pet. ¶ 3.) Following a second trial, Smith was convicted on both counts and sentenced to life plus twenty years.[2] (*Id.*)

The Circuit Court aptly summarized the evidence of the crime as follows:

> At trial, the victim testified that on July 28, 2011, she was running on a rural road in Mathews County when the petitioner, who was driving a truck toward the victim, stopped his vehicle and asked her if she knew where "the Edwards" lived. The victim said "no" and continued her run. A minute later, the petitioner parked his vehicle at an angle in front of the victim, cutting off her running route. The petitioner again asked the victim if she knew the Edwards. When she responded that she did not, the petitioner said, "[O]kay, get in the

---

[1] Smith's prior conviction of rape, subjected him to, among other things, a mandatory life sentence if he was convicted of abduction with intent to defile. Va. Code Ann. § 18.2–67.5:3 (2011).

[2] The jury took roughly an hour and forty minutes to reach a verdict at the second trial. (Aug. 23, 2012 Tr. 150, ECF No. 14–2.)

truck." When the victim replied, "[N]o, I'm okay," the petitioner said "very firmly," "[N]o, get in the truck."

While this exchange was occurring, the petitioner approached the victim and moved behind her. He put his hands on her upper arms and pushed her toward the truck. The victim resisted and screamed for help. At trial, she recalled her shoes "sliding in the gravel" as the petitioner pushed her toward his truck. Thereafter, the petitioner picked the victim up by her arms attempted to "shove [her] feet first into the driver's side of the truck."

The victim was able to brace her feet on the frame of the door and she prevented the petitioner from pushing her into the truck. However, while the petitioner held the victim against the door frame, he removed one hand from her arm and placed it inside her shorts so that his fingers were on the built-in underwear over her vagina.

Eventually, the victim was able to break free and she ran to a neighbor's home. The victim testified that she was able to see the petitioner clearly, both when he asked her for directions initially and when during the struggle to push the victim into the truck.

(*Smith v. Clarke*, No. CL13–59, at 2–3, (Va. Cir. Ct. Feb. 6, 2014) ECF No. 7-7 (alterations in original).)

### I. Smith's Claims

In his § 2254 Petition, Smith demands relief upon the following grounds:[3]

Claim I    Trial counsel failed to move for a new jury panel after a prospective juror, Mr. Fernald, announced in open court that he knew the Petitioner from a "prior crime similar to—." And, during a sidebar discussion, (which was overheard by the juror panel in the courtroom), Mr. Fernald stated he had direct knowledge of the previous rape case, and the Petitioner "picked the girl up, he took her."
(§ 2254 Pet. ¶ 25.)

Claim II    Trial counsel failed to impeach [V's] testimony regarding her prior sworn testimony at the preliminary hearing and the first trial that she had not taken any steps to find out who the perpetrator was other than through the police, when Inv. Riley's notes indicate the contrary.
(*Id.* ¶ 39.)[4]

---

[3] The Court omits the emphasis in the quotations from Smith's submissions.

[4] The Court refers to the victim of the attack simply as "V."

| | |
|---|---|
| Claim III | Counsel failed to present a stipulation he obtained from nurse Terry Haywood (or other similar evidence) that, on August 22, 2011, the Petitioner measured 6'5" tall and weighed 364 pounds to refute ["V's"] report and testimony that her attacker was 5'9" to 5'10" and weighed 250 pounds.<br>(*Id.* ¶ 49.) |
| Claim IV | Counsel failed to present testimony from Deputy Stragal that, as an experienced law enforcement agent, he "was concerned about" the fact that the Petitioner was "a lot bigger" than "V" had reported.<br>(*Id.* ¶ 52.) |
| Claim V | Counsel failed to object, on hearsay and confrontation grounds, to the testimony of Inv. Riley that an unidentified [female] bank [employee] told him that Balderson made no debit card transactions on July 28, 2011, but did so on July 29, 2011, and that no such transactions would have posted the day after the transactions actually occurred.<br>(*Id.* ¶ 58.) |
| Claim VI | The Petitioner was denied the right to effective assistance of counsel as a result of any and all of counsel's errors in Claims I through V, and prejudice must be viewed in the aggregate within the totality of the circumstances.<br>(*Id.* ¶ 66.) |

During state habeas proceedings, Smith presented Claim II and Claim IV. (§ 2254 Pet. ¶ 17.) Smith's remaining claims of ineffective assistance of counsel were not presented in state court and are potentially subject to default. (*Id.*) Nevertheless, "in light of *Martinez v. Ryan*, [566 U.S. 1] (2012), the Court addresses the merits of these claims." *Cottrell v. Clarke*, No. 3:16cv200, 2016 WL 5662023, at *2 (E.D. Va. Sept. 29, 2016) (citing *Martinez*, 566 U.S. at 22 (Scalia, J., dissenting)).[5] For the reasons set forth below, the Court will grant Respondent's Motion to Dismiss and deny the § 2254 Petition.[6]

---

[5] In *Martinez*, Justice Scalia accurately observed that "as a consequence of today's decision the States will *always* be forced to litigate in federal habeas, for *all* defaulted ineffective-assistance-of-trial-counsel claims . . . [including] the validity of the defaulted claim (where collateral-review counsel was not appointed)." *Martinez*, 566 U.S. at 22-23 (Scalia, J., dissenting). Smith was not represented by counsel on state habeas.

[6] Given the relatively straightforward procedural posture of this case, no need exists to recite exhaustively the procedural history of the claims raised in state court.

3

## II. Ineffective Assistance of Counsel

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel's representation was deficient and, second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

### A. Failure to Move for a New Jury Panel

In Claim I, Smith faults counsel for not moving "for a new jury panel after a prospective juror, Mr. Fernald, announced in open court that he knew the Petitioner from a 'prior crime similar to—.'" (§ 2254 Pet. ¶ 25.) At this juncture, it is appropriate to recount the sequence of events surrounding this claim. At the inception of voir dire, the Circuit Court informed the venire that Smith was "charged with two offenses. One is abduction with intent to defile, having previously been convicted of rape. And, secondly, aggravated sexual battery having previously been convicted of rape." (Aug. 22, 2012 Tr. 59, ECF No. 8–3.) Thereafter, the Circuit Court asked the venire persons whether any of them knew Smith. (Aug. 22, 2012 Tr. 60.) Mr. Fernald raised his hand and stated that he knew Smith "[s]ocially." (Aug. 22, 2012 Tr. 60.) Then, the following exchange occurred:

4

| | |
|---|---|
| THE COURT: | Okay. Would the social contact that you have had with him make it difficult or impossible for you to listen to the evidence in this case and render a fair and impartial verdict for both parties? |
| [FERNALD]: | We had a, I guess, it was a prior crime similar to -- |
| MR BOWEN: | Your Honor, I don't know what he's going to say, but I would wonder if we need to take him up outside of the presence of the other jurors? |
| THE COURT: | We could do that. We'll pass Mr. Fernald for just a second. . . . |

(Aug. 22, 2012 Tr. 61.)

Shortly thereafter, at a sidebar, the Circuit Court questioned Mr. Fernald.

| | |
|---|---|
| THE COURT: | Mr. Fernald, if you would come up also, please. Sir, you have indicated to me that you had some knowledge of Mr. Smith or were related by blood or marriage. |
| [FERNALD]: | We were at a party one night, and I guess it was in the first case, the rape or whatever. And -- |
| THE COURT: | We being who? |
| [FERNALD]: | He picked the girl up, he took her. |
| THE COURT: | What? |
| MR CAPRIO: | I'm listening. |
| MR. BOWEN: | What he's saying is the previous rape case, he has knowledge of the previous rape. |
| THE COURT: | Okay. |
| MR. BOWEN: | He was at the party where the girl was, Wesley took her. |
| THE COURT: | Do you want him to stay or go? |
| MR. CAPRIO: | He has to go. |
| MR. BOWEN: | It's appealable. |
| THE COURT: | So we are going to excuse you. Thank you. You may go. . . . |

(Aug. 22, 2012 Tr. 68–69, ECF No. 9–1.) Although the foregoing exchange took place at a sidebar, Smith, who was seated at the defense table, heard the whole exchange. (§ 2254 Pet. Ex. 1 "Smith Aff." ¶ 9, ECF No. 1–1.) Smith insists that the jurors, who were seated even closer to the exchange must have heard it as well. (*Id.*)

Assuming counsel knew the venire had heard the above exchange, given the totality of the circumstances, Smith fails to demonstrate counsel acted deficiently by not demanding a new venire. At best, the above exchange potentially suggested to the prospective jurors that Smith also had abducted the woman he had raped. Nevertheless, shortly after Mr. Fernald was

dismissed, the prospective jurors unequivocally assured the Circuit Court that they did not "know any reason whatsoever why [they could not] give both sides in this case a fair and impartial trial[.]" (Aug. 22, 2012 Tr. 76.) Counsel was well aware that, given the nature of the criminal charges, he was not going to be able to shield the jury from the fact his client had a proven history of serious sexual misconduct. Counsel further knew that the prosecution's first exhibit would be a stipulation regarding the prior rape conviction. (Aug. 22, 2012 Tr. 119–24, ECF No. 10-2.) Additionally, counsel knew that the stipulation would be followed by a jury instruction which read: "Previous conviction is an element. Evidence that the defendant was previously convicted of rape should be considered only for proof of the element of a prior conviction and not as proof he committed the offenses for which he is charged." (Aug. 22, 2012 Tr. 125.)

In order to prevail on this claim, Smith must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch*, 273 F.3d at 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). He fails to do so. Given the circumstances recited above, Smith fails to demonstrate that counsel acted unreasonably by not moving for a new jury panel on the possibility that the jurors might have been unalterably biased by Mr. Fernald's comments. Furthermore, Smith fails to demonstrate any possibility that the Circuit Court would have granted a motion for a new jury panel had counsel so moved. Indeed, Smith does not even identify the statute or case law that would govern such a motion. Smith would not be entitled to strike a juror or an entire panel of jurors simply because they heard something about the crime or the accused. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("It is not required, however, that the jurors be totally ignorant of the facts and issues involved."); *see also Murphy v. Florida*, 421 U.S. 794, 801 n.5 (1975) (upholding the seating of a juror, who was later rehabilitated, but who initially stated during voir dire that, "My experience of [the accused] is such that right now I would find him guilty."). Here, Smith's

previous conviction for rape constituted an element of the offense before the jury. The law clearly holds that a prospective juror with prior knowledge of a crime or a defendant can nevertheless "lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723 (citations omitted). Smith's jurors assured the Circuit Court that they could do just that. Accordingly, Claim I will be dismissed because Smith fails to demonstrate deficiency or prejudice.

### B.  Alleged Failure to Impeach "V"

In Claim II, Smith faults trial counsel for failing to impeach "V" with her testimony from the preliminary hearing that she had not taken any steps to identify who the perpetrator was other than through the police. (§ 2254 Pet. 12.) Analysis of this claim and its lack of merit requires a preliminary understanding of the victim's testimony.

#### 1.  "V's" Compelling Identification of Smith as Her Attacker

As explained below, "V" convincingly and consistently identified Smith as her attacker and "V" identified Smith's truck as the vehicle driven by her attacker.

On August 28, 2011, at roughly 8:30 p.m., shortly after the attempted abduction, Sergeant Hill interviewed "V." (Aug. 22, 2012 Tr. 180–81.) "V" described her attacker as a "large white male" with "some facial hair," and "wearing a gray baggy tee shirt." (Aug. 22. 2012 Tr. 182.) "V" described her attacker's vehicle as: "a small truck, a two-door truck," (Aug. 22, 2012 Tr. 183); and "gray or tan in color . . . . possibly camouflage," (Aug. 22, 2012 Tr. 182–83).[7]

Investigator Bill Riley spoke briefly to "V" on July 29, 2011, the morning after the assault. (Aug. 22, 2012 Tr. 189–90.) "V" provided a similar description of her attacker to Riley

---

[7] Robert E. Coxton testified that he gave his old pick up to Smith. (Aug. 23, 2012 Tr. 71-72.) Coxton's testimony corroborated "V's" description of the truck utilized by her attacker. Coxton testified that, at dusk, the truck he gave to Smith, appears to be "[d]ark gray." (Aug. 23, 2012 Tr. 77.) Coxton, who had purchased the paint for the paint job of the truck, said the truck also appears to have significant tan highlights. (Aug. 23, 2012 Tr. 79.)

7

that she had provided to Sergeant Hill. (Aug. 22, 2012 Tr. 190.) "V" elaborated that her attacker was "heavy set, 250 pounds," and five-foot-nine to five-foot-ten inches tall. (Aug. 22, 2012 Tr. 213.) "V" described the attacker's truck to Riley as "a gray-ish camouflage looking truck, unusual camouflage. . . . an older model . . . , two door, dark gray or camo, dull looking." (Aug. 22, 2012 Tr. 191.) Riley delayed further interviewing "V" at that time because, according to his training and experience, it is best to wait 24 to 48 hours after an attack to get the most complete statement from a victim. (Aug. 22, 2012 Tr. 191–922.)

Riley's son and Smith's sons are good friends. (Aug. 22, 2012 Tr. 193.) On Sunday, July 30, 2011, Riley and his son drove to Smith's house to pick up a boat Smith had given to Riley's son. (Aug. 22, 2012 Tr. 193–94.) Upon arriving at Smith's house, Riley observed Smith, a big guy wearing a gray baggy tee shirt, and Smith's truck. (Aug. 22, 2012 Tr. 197.) Smith's pickup truck was an older model, small truck that had been painted with a "funny looking camouflage." (Aug. 22, 2012 Tr. 196–97; Commonwealth Ex. 7.) Riley concluded that Smith was a suspect. (Aug. 22, 2012 Tr. 197.)

The next morning, August 1, 2011, Riley created a photospread that included Smith and eleven other similar looking individuals and went to interview "V." (Aug. 22, 2012 Tr. 198.)[8] Riley told "V" that "if you recognize anyone, point them out. If you don't it doesn't matter." (Aug. 22, 2012 Tr. 200.) "V" looked at the first set of six pictures, which did not contain Smith's photo, and said she did not see her attacker. (Aug. 22, 2012 Tr. 200.) As soon as Riley

---

[8] During this interview, "V" described the camouflage on the truck as "up and down," (Aug. 22, 2012 Tr. 200) and the interior as gray (Aug. 22, 2012 Tr. 201), which is consistent with Smith's truck. (Commonwealth's Ex. 7.)

8

showed "V" the next six pictures, "V" immediately identified Smith as her attacker.[9] (Aug. 22, 2012 Tr. 200; Commonwealth Exs. 2A, 2B.)

At the time of trial, "V" testified she was "[a] hundred percent certain" in her identification of Smith as her attacker. (Aug. 22, 2012 Tr. 131.) "V" adamantly asserted that she recognized Smith "from his eyes." (Aug. 22, 2012 Tr. 161.) "V" testified that Smith was the attacker "without a shadow of a doubt. There are many people I have learned that have similar features to him; tall men, big men, dirty men, as you were that night, but none that looked exactly like him. None that have those eyes that I looked directly into that night." (Aug. 22, 2012 Tr. 161.)

Additionally, "V" was shown a photo array of camouflage pickup trucks, from which she selected Smith's truck. (Aug. 22, 2012 Tr. 135.) "V" testified that she was "positive, a hundred percent" certain the truck she identified was the one driven by her attacker because of its "very unusual pattern of camouflage. [She] had never seen anything like it." (Aug. 22, 2012 Tr. 135.) Riley also testified that he was not aware of any other truck in Mathews County that looked like Smith's truck. (Aug. 22, 2012 Tr. 219.)

### 2. The Substance of Claim II

According to Smith, Investigator Riley's notes from January 14, 2012 reflect that "V" and friends of "V" attempted to identify her attacker through sources other than the police, such as the internet. (§ 2254 Pet. 13; *id.* Ex. 5.) Riley's notes, however, reflect that "V" was not able

---

[9] After speaking with "V," Riley and his partner, Deputy Stragal, went to Smith's home and explained to Smith that "V" had identified him as having attacked her. (Aug. 22, 2012 Tr. 202–03.) They explained to Smith that they needed to look at Smith's truck. (Aug. 22, 2012 Tr. 203.) Smith told them to "go do anything you want to." (Aug. 22, 2012 Tr. 203.) Riley and Stragal dusted the cab area and driver door area of Smith's truck for fingerprints. (Aug. 22, 2012 Tr. 203–04.) They did not find prints of any kind, which Investigator Riley thought was "unusual." (Aug. 22, 2012 Tr. 204–05.)

to utilize the internet or the sex offender registry to identify Smith, until *after* she already had identified Smith in the photo array on August 1, 2011. Specifically, Riley's summary of his discussion with "V" states:

> Summary: No one gave or suggested name or picture to ["V"] until *after* she made photo ID w/Inv Bill Riley. ["V"] tried to look up sex offenders on internet b4 ["V"] met with Riley but ["V"] was unable to do so bc she did not have internet access & bc she had poor cell phone service on her phone.

(§ 2254 Pet. Ex. 5.) Thus, Riley's notes hardly provide a fruitful basis for impeaching "V." Smith also fails to identify what "V" said during her testimony on August 22, 2012, that was inconsistent with Riley's notes. Moreover, as discussed above, given the consistency and certainty of "V's" identification of Smith and his truck, Smith fails to demonstrate that he was prejudiced by counsel's failure to pursue this line of impeachment he urges here. *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (observing that in assessing prejudice under *Strickland*, the "likelihood of a different result must be substantial, not just conceivable" (citing *Strickland*, 466 U.S. at 693)).

Given the foregoing circumstances, Smith fails to demonstrate that counsel acted deficiently or that Smith was prejudiced by counsel's failure to pursue the line of impeachment Smith describes here. Accordingly, Claim II will be dismissed.

### C. Failure to Introduce a Stipulation Pertaining to Smith's Height and Weight

In Claim III, Smith faults counsel for failing "to present a stipulation he obtained from nurse Terry Haywood (or similar evidence) that, on August 22, 2011, the Petitioner measured 6'5" tall and weighed 364 pounds to refute ["V's"] report and testimony that her attacker was 5'9" to 5'10" and weighed 250 pounds." (§ 2254 Pet. ¶ 49.) Smith, however, fails to demonstrate that this stipulation has any evidentiary provenance. For example, Smith has not obtained an affidavit from Nurse Haywood indicating that she weighed and measured Smith on

August 22, 2011, and he was 6'5" tall and weighed 364 pounds. Indeed, other evidence in the record indicates that Smith was significantly shorter and lighter than represented by the stipulation. For example, the Warrant of Arrest for Smith, which was executed on August 22, 2011, lists Smith's height as 6'3" and his weight as 300 pounds. Warrant of Arrest 1, *Commonwealth v. Smith*, No. CR12-03 (Va. Cir. Ct. filed Jan. 27, 2012).[10] Thus, Smith fails to demonstrate that counsel acted deficiently for failing to present a stipulation or other evidence to indicate Smith measured 6'5" tall and weighed 364 pounds because such evidence simply did not exist.

Moreover, counsel reasonably chose to exploit "V's" inaccurate estimation of her attacker's height and weight by visually demonstrating to the jury the discrepancy between that estimation and Smith's appearance. Namely, counsel had Smith's brother-in-law, who was 5'10" and 258 pounds, stand next to Smith so the jury could "see a person who was the size described initially by the victim." (Aug. 23, 2012 Tr. 26.) As Smith fails to demonstrate counsel acted deficiently, Claim III will be dismissed.

### D. Failure to Call Deputy Stragal to Testify

In Claim IV, Smith faults counsel for failing to call Deputy Stragal to testify. At the first trial that ended in a hung jury, the Commonwealth had called Deputy Stragal. During cross-examination by Smith's attorney, Deputy Stragal had acknowledged that he initially "was concerned" that "V" had described her attacker as "5 - foot - 9, 5 - foot - 10, and 250," and "the person she picked out of the lineup was a lot bigger." (Apr. 24, 2012 Tr. 123, ECF No. 16–2.) Deputy Stragal was not called by the defense or the prosecution at the second trial.

---

[10] Additionally, an arrest warrant for Smith from March of 2003 lists Smith's height as 6'3" and his weight as 270 pounds. Warrant of Arrest 1, *Commonwealth v. Smith*, No. CR12-03 (Va. Cir. Ct. filed Jan. 27, 2012).

11

Deputy Stragal, however, also provided testimony that was detrimental to Smith's case. Deputy Stragal testified that he was six feet tall and weighed 290 pounds. (Apr. 24, 2012 Tr. 120, 124.) Deputy Stragal related that "V" initially described her attacker as "about roughly [Stragal's] height, but larger." (Apr. 24, 2012 Tr. 120). Deputy Stragal also testified that when he first saw Smith's truck, "[i]t struck [him] as being the same type of truck, same type of [paint] scheme that ["V"] was describing." (Apr. 24, 2012 Tr. 122.)

"[T]he standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Harrington*, 562 U.S. at 105. The Court "must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The [petitioner must] show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id.* at 104 (internal quotation marks omitted) (citations omitted). Given the equivocal value of Deputy Stragal's testimony, Smith fails to satisfy this demanding standard and demonstrate that counsel acted deficiently or that Smith was prejudiced. Accordingly Claim IV will be dismissed.

### E. Failure to Object to Investigator Riley's Testimony

Claim V pertains to testimony the prosecution used to refute Smith's alibi. A proper analysis of this claim benefits from first understanding Smith's alibi and the substantial evidence the prosecution mustered to refute that alibi.

#### 1. Smith's Alibi

At trial, Smith testified that he could not have attacked "V" because he spent July 28, 2011 with his son and John Balderson. Specifically, Smith testified that on the morning of July 28, 2011, he and his son went to Tractor Supply in Gloucester when the store opened around

8:00 a.m. and paid cash for a bag of dog food. (Aug. 23, 2012 Tr. 34, 37, 54.) After buying dog food, Smith "got in the truck [and] came home." (Aug. 23, 2012 Tr. 20.) Smith arrived home around 9:00 a.m. (Aug. 23, 2012 Tr. 20, 39.)

Smith testified that he then spoke by phone with John Balderson who asked for Smith's assistance in installing some shims on Balderson's fishing boat. (Aug. 23, 2012 Tr. 21.) Balderson told Smith that "he was going to go by North Machine Shop and get the shims" and Balderson would meet Smith at the fishing boat. (Aug. 23, 2012 Tr. 35.) Smith and his son then drove to Gwynn's Island where Balderson kept his boat. (Aug. 23, 2012 Tr. 21.) Smith installed the shims and then returned home. (Aug. 23, 2012 Tr. 22.) Around 4:00 or 4:30 that afternoon, Smith and his son returned to Balderson's boat and went fishing with Balderson until around midnight. (Aug. 23, 2012 Tr. 23.)

Smith's son confirmed his father's story that, on July 28, 2011: they bought a single bag of dog food from Tractor Supply in the morning, (Aug. 22, 2012 Tr. 230); they returned home and then went to help Balderson install shims on his fishing boat, (Aug. 22, 2012 Tr. 231); upon arriving at Balderson's boat, all the tools were ready, but Balderson had to go get the shims to install on the fishing boat (Aug. 22, 2012 Tr. 239); after installing the shims, around 10:00 or 10:30 a.m., Smith and his son returned home (Aug. 22, 2012 Tr. 240); and, around 4:30 p.m., Smith and his son returned to Balderson's boat and went fishing with Balderson until midnight. (Aug. 22, 2012 Tr. 232).

Balderson also attempted to confirm Smith's whereabouts on July 28, 2011. Balderson stated that he clearly remembered July 28, 2011 because that was the only time he had ever installed shims to fix the fishing net reel on his boat. (Aug. 22, 2012 Tr. 246–47.) Balderson testified that on July 28, 2011, he went to the North Machine Shop to purchase the metal shims

13

to fix his boat.[11] (Aug. 22, 2012 Tr. 246, 251.) Balderson asserted that, later that day, Smith and his son helped him install the metal shims on his boat. (Aug. 22, 2012 Tr. 247.) After the shims were installed, Balderson stated that he, Smith, and Smith's son went fishing at around 4:00 p.m. that afternoon. (Aug. 22, 2012 Tr. 247.) Neither Balderson, nor Smith, nor Smith's son produced any objective evidence to corroborate this alibi.

### 2. The Prosecution's Evidence Refuting Smith's Alibi

On rebuttal, the prosecution produced a number of documents that indicated this alibi was demonstrably false. Specifically, the prosecution's evidence reflected that the activities described by Balderson, Smith, and Smith's son had occurred on July 29, 2011, the day after the attempted abduction.

The prosecution called Walter Metzger, the owner of the North Machine Shop. (Aug. 23, 2012 Tr. 62.) The prosecution introduced Metzger's log book, which listed the items sold from his shop. (Commonwealth Ex. 14.) Metzger testified that the log book reflected that Balderson had picked up the metal shims on July 29, 2011, not July 28, 2011. (Aug. 23, 2012 Tr. 62–63.) On cross-examination, Smith could not provide a convincing explanation as to why the business records reflected that the shims had been picked up on July 29, 2011, not on July 28, 2011. (Aug. 23, 2012 Tr. 40–42.) Instead, Smith testified that he "put the shims in on the 28th [and] [w]e had a set of shims on the boat." (Aug. 23, 2012 Tr. 42.) Of course, this did not square with the records from the North Machine Shop or the testimony of Smith's son and Balderson.

---

[11] Balderson related that prior to going to the North Machine Shop, he went to 7-Eleven. (Aug. 22, 2012 Tr. 250.) After leaving the North Machine Shop, Balderson testified that he went to Wal-Mart. (Aug. 22, 2012 Tr. 250, 254.) Smith testified that, after installing the shims, Balderson told him he was going to Wal-Mart and then Balderson called him from the Wal-Mart. (Aug. 23, 2012 Tr. 43–44.) Claim V flows from the prosecution's efforts to impeach Balderson's testimony about the date he went to the 7-Eleven and Wal-Mart.

Additionally, the prosecution called David Christopher Cirillo, the assistant store manager at the Tractor Supply Company where Smith allegedly had purchased dog food around 8:00 a.m. on the morning of July 28, 2011. Cirillo produced copies of the receipts for purchases in his store on July 28, 2011. (Aug. 23, 2012 Tr. 53–54; Commonwealth Ex. 13.) Those receipts refuted Smith's story that he had purchased a bag of dog food with cash shortly after the store opened at 8:00 a.m. (Aug. 23, 2012 Tr. 54–55; Commonwealth Ex. 13.) The only cash purchase for a single bag of dog food that day occurred at 11:21 a.m. (Aug. 23, 2012 Tr. 54–55; Commonwealth Ex. 13.) On cross-examination, Smith could not offer any explanation as to why the Tractor Supply Company did not have a record of his early morning purchase of a bag of dog food. (Aug. 23, 2012 Tr. 37–40.)

### 3. The Testimony and Evidence that Is the Subject of Claim "V"

On cross-examination, Balderson acknowledged that, prior to trial, he had met with Investigator Riley and called the debit card company to confirm the date of his transactions at the 7-Eleven and Wal-Mart. (Aug. 22, 2012 Tr. 253.) The following exchange then occurred:

```
Q.   And the two of you sat there, and you had the debit card company on
speaker phone --
A.   Right.
Q.   -- correct?
A.   Yeah.
Q.   And you were trying to determine the date these transactions occurred,
correct?
A.   Yup.
Q.   And the debit card company told you that on the 29th of July, not the 28th,
the 29th is when these transactions for 7-Eleven and Wal-Mart show up, correct?
A.   Yeah. But --
Q.   Yes or no?
A.   Yeah.
Q.   And it shows the time of the transactions, 11:40 a.m. for 7-Eleven and
1:51 p.m. for Wal-Mart, correct?
A.   That is not what the lady said on the phone.
Q.   Okay.
```

> A. Because Bill Riley asked 'em why is it the 29th, she told me that's when it was processed. That even though it was done on the 28th, that's when they processed it. It was on the 29th, so we asked them that question ourselves.
> . . . .
> Q Would it surprise you that Mr. Riley's memory is that you were told by the debit card company that no transactions took place on the 28th?
> A. Say that again now.
> Q. Would it surprise you that Investigator Riley's memory of the conversation was that the lady from the debit card company said there were no transactions occurring on the 28th, and that she said these occurred on the 29th, you turned to Investigator Riley and said well, I guess that's right. Do you remember that conversation?
> A. No, I don't remember saying that's right. I just -- we started at the 7-Eleven, that's where it all took place.
> . . . .
> Q. So it is your recollection that the lady said they didn't process it until the 29th?
> A. Right.
> Q. And it occurred on the 29th?
> A. That's my assumption.
> Q. Do you recall Investigator Riley asking you when he heard the lady tell him that these transactions occurred on the 29th, that none of the transactions occurred on the 28th, that you said that must be right, or I guess that's right?
> A. I don't remember -- recall saying that.
> Q. You don't recall that?
> A. No, sir.

(Aug. 22, 2012 Tr. 255–57.)

On rebuttal, the prosecution recalled Investigator Riley to demonstrate that Balderson previously had acknowledged to Investigator Riley that the 7-Eleven and Wal-Mart transactions had occurred on July 29, 2011.

> Q. Could you explain the conversation you had with Mr. Balderson that day regarding the transactions on July 28 and July 29, 2011.
> A. *We called the bank to see if he had any transactions on the 28th of July, and they said no.* It was the Bank of Lancaster, is who he deals with. *We called the 800 number and they said there were no transactions on the 28th; there were transactions on the 29th. And the two transactions that occurred on the 29th was $42.50 to 7-Eleven in Hudgins, Virginia, at 11:41 a.m., and then $163.97 at Walmart at 1:51 p.m.*
> Q. Now, was there any discussion as to whether the July 29 date was the date the transaction occurred, or the date they post it to the account?
> A. *I asked the lady if he did these transactions on a date, could they post a day later or something like that. She said because he used a debit card, and he*

16

> *didn't use it as credit, it's going to subtract from the account then. So these transactions occurred on the 29th.*
> Q.   Okay. Now Mr. Balderson -- you had the phone on the speaker?
> A.   Yes.
> Q.   So he could hear this conversation?
> A.   Yes, he was talking to the lady as well as I.
> Q.   Okay. Did you then confront Mr. Balderson about these transactions occurring on the 29th?
> A.   *I asked him. I said if the bank says these occurred on the 29th, they occurred on the 29th. And he said well, if she says they happened on the 29th, they happened on the 29th.*

(Aug. 23, 2012 Tr. 67–68.)

In Claim V, Smith asserts that counsel's failure to object to all of the above-highlighted testimony was deficient. Smith asserts that the highlighted statements constitute inadmissible hearsay that "was testimonial in nature and its admission was contrary to the Confrontation Clause.[12]" (§ 2254 Pet. ¶ 63 (citation omitted).)[13] No need exists to assess whether counsel performed deficiently, because this claim is readily dismissed because Smith fails to demonstrate prejudice.

Even excluding the objectionable testimony from Riley, the prosecution already had thoroughly discredited Smith's alibi. Smith was not able to produce a shred of objective evidence to verify his assertion that he spent July 28, 2011 in the company of his son and Balderson. On the other hand, the prosecution introduced unbiased testimony and objective receipts that flatly refuted Smith's assertion that he spent July 28, 2011 purchasing dog food

---

[12] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI.

[13] Respondent does not dispute Smith's assertion that the highlighted testimony was inadmissible.

17

from the Tractor Supply Company and installing shims on Balderson's boat.[14] Furthermore, the prosecution introduced compelling testimony identifying Smith as "V's" attacker and Smith's truck as the vehicle used by "V's" attacker. Given these circumstances, Smith fails to demonstrate that he was prejudiced by counsel's failure to challenge the objectionable portion of Riley's testimony. *Harrington*, 562 U.S. at 111 (observing that for the *Strickland* prejudice component "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." (citations omitted)). Accordingly, Claim V will be dismissed.

### F. <u>Cumulative Prejudice</u>

In Claim VI, Smith contends: "The Petitioner was denied the right to effective assistance of counsel as a result of any and all of counsel's errors in Claims I through V, and prejudice must be viewed in the aggregate within the totality of the circumstances." (§ 2254 Pet. ¶ 66.) The cumulative analysis that Smith advances is not permitted here because, with the exception of Claim V, the Court has rejected Smith's assertion that counsel performed deficiently. *Fisher v. Angelone*, 163 F.3d 835, 852–53 (4th Cir. 1998). Attorney "acts or omissions 'that are not unconstitutional individually cannot be added together to create a constitutional violation.'" *Id.* (quoting *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996)). Accordingly, Claim VI will be dismissed.

---

[14] Of course, the prosecution could admit as a prior inconsistent statement Investigator Riley's testimony that Balderson had acknowledged the 7-Eleven and Wal-Mart transactions had occurred on the 28th of July.

## IV. CONCLUSION

Smith's claims will be dismissed. The Motion to Dismiss (ECF No. 6) will be granted. The § 2254 Petition (ECF No. 1) will be denied. The action will be dismissed. The Court will deny a certificate of appealability.[15]

An appropriate Final Order will accompany this Memorandum Opinion.

Date: 3/24/17
Richmond, Virginia

/s/ M. Hannah Lauck
United States District Judge

---

[15] An appeal may not be taken from the final order in a habeas corpus proceeding unless a judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). A certificate of appealability will not issue unless a prisoner shows "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks omitted) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).